# United States Court of Appeals

## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued April 1, 2019   Decided August 20, 2019

No. 18-1085

CALIFORNIA COMMUNITIES AGAINST TOXICS, ET AL.,
PETITIONERS

v.

ENVIRONMENTAL PROTECTION AGENCY AND ANDREW
WHEELER, ADMINISTRATOR, U.S. ENVIRONMENTAL
PROTECTION AGENCY,
RESPONDENTS

AIR PERMITTING FORUM, ET AL.,
INTERVENORS

———

Consolidated with 18-1095, 18-1096

———

On Petitions for Review of Action of the
United States Environmental Protection Agency

———

*Sanjay Narayan* argued the cause for Environmental Petitioners. With him on the briefs were *James S. Pew*, *Tomás E. Carbonell*, *Vickie Patton*, *Surbhi Sarang*, *John Walke*, *Emily Davis*, *Thomas Zimpleman*, and *Keri N. Powell*.

*Kavita P. Lesser*, Deputy Attorney General, Office of the Attorney General for the State of California, argued the cause

for petitioner State of California. With her on the briefs were *Xavier Becerra*, Attorney General, *David A. Zonana*, Deputy Attorney General, and *Jonathan Wiener*, Deputy Attorney General.

*Eric Grant*, Attorney, U.S. Department of Justice, argued the cause for respondents. On the brief were *Jeffrey Bossert Clark*, Assistant Attorney General, *Jonathan D. Brightbill*, Deputy Assistant Attorney General, and *Scott Jordan*, Attorney, U.S. Environmental Protection Agency.

*Shannon S. Broome* argued the cause for intervenors-respondents Air Permitting Forum, et al. With her on the briefs were *Charles H. Knauss*, *Leslie Sue Ritts*, *Makram B. Jaber*, and *Andrew D. Knudsen*.

*David M. Friedland*, *Leslie A. Hulse*, *Felicia H. Barnes*, *Steven P. Lehotsky*, *Michael B. Schon*, and *amici curiae* American Chemistry Council, et al. in support of respondents.

Before: ROGERS and WILKINS, *Circuit Judges*, and SILBERMAN, *Senior Judge*.

Opinion for the Court filed by *Circuit Judge* WILKINS.

Dissenting Opinion filed by *Circuit Judge* ROGERS.

This case asks us to determine the nature of an agency action, an inquiry that – paradoxically – is quotidian but abstruse. When we are confronted with agency action, the litany of questions is by now very well-rehearsed: Is it final? Is it ripe? Is it a policy statement? Is it an interpretive rule? Is it a legislative rule? Despite the clarity of these questions, however, predictable answers have eluded courts and commentators. *See, e.g., Perez v. Mortg. Bankers Ass'n.*, 135

S. Ct. 1199, 1204 (2015) (describing the question of how to distinguish between legislative and interpretive rules as "the source of much scholarly and judicial debate"); *Ticor Title Ins. Co. v. FTC*, 814 F.2d 731, 745 (D.C. Cir. 1987) (opinion of Williams, J.) (characterizing the law governing finality and ripeness as "chaotic"); Ronald M. Levin, *Rulemaking and the Guidance Exemption*, 70 ADMIN L. REV. 264, 348 (2018) ("The standard view among commentators is that [distinguishing between legislative and nonlegislative rules] is exceptionally perplexing and incoherent."). Indeed, the nature of agency action, it seems, is too often in the eye of the beholder. We resolve the instant matter, therefore, with our eye toward the "continuing project" of clarifying this "byzantine" area of the law. *Nat'l Min. Ass'n v. McCarthy*, 758 F.3d 243, 246 (D.C. Cir. 2014).

The agency action before us is a 2018 memorandum ("Wehrum Memo") that William L. Wehrum, Assistant Administrator for the Environmental Protection Agency's ("EPA") Office of Air and Radiation, issued to all Regional Air Division Directors. The Wehrum Memo declares that the plain language of § 112 of the Clean Air Act ("Act" or "CAA"), 42 U.S.C. § 7412, *compels* the conclusion that a source of toxic emissions classified as "major" can reclassify to an "area source," and thereby ease its regulatory burden, at any time after it limits its potential to emit to below the major source threshold. J.A. 1. The Wehrum Memo states that it supersedes a prior 1995 EPA memorandum ("Seitz Memo") issued by John Seitz, then Director of EPA's Office of Air Quality Planning and Standards, which interpreted § 112 to mean that once EPA classifies a source as major, that source can never reclassify to area source status, even if it limits its potential to emit to below the major source threshold. *Id.*

Petitioners are the State of California and a group of environmental organizations whose citizens and members, respectively, breathe the air in the vicinity of regulated sources. EPA is the Respondent, and a group of industry organizations have joined as Intervenor. Petitioners contend that we can and should review the Wehrum Memo because it is final agency action and prudentially ripe. Moreover, Petitioners argue, the Wehrum Memo is a legislative rule, and it is therefore procedurally defective under the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.*, because EPA failed to provide notice and comment before issuing it, *see id.* § 553. But even if we hold that the Wehrum Memo is an interpretive rule (for which notice and comment is not required, *see id.*), Petitioners contend that we still must vacate it because EPA's interpretation of § 112 is incorrect. Respondent and Intervenor retort that this Court lacks jurisdiction over the Wehrum Memo because it is not final agency action. Alternatively, they argue, we should not review it because it is not prudentially ripe. If, however, we find the Wehrum Memo final and ripe, Respondent and Intervenor assert, we must deny the petitions because it is an interpretive rule and is thus procedurally sound, and its interpretation of § 112 is correct.

For the reasons explained herein, we hold that the Wehrum Memo is not final agency action, and we dismiss the petitions for lack of subject matter jurisdiction under the Act. We express no opinion as to whether the Wehrum Memo is prudentially ripe, an interpretive rule or a legislative rule, or on the merits of its interpretation of § 112. In holding that the Wehrum Memo is not final, we emphasize two points. First, when assessing the nature of an agency action (including whether it is final), courts should resist the temptation to define the action by comparing it to superficially similar actions in the caselaw. Rather, courts should take as their NorthStar the unique constellation of statutes and regulations that govern the

action at issue. Second, although all legislative rules are final, not all final rules are legislative, and the finality analysis is therefore distinct from the test for whether an agency action is a legislative rule.

## I.

Because they share a progenitor, a reliable approach to understanding a James Baldwin novel is to compare it, according to a set of criteria, to another work in his oeuvre. Indeed, a thematic reading of *Giovanni's Room* is sure to inform such a reading of *The Fire Next Time*, and vice versa. Not so, however, with respect to the broad set of phenomena we categorize as agency action. Because few, if any, of them are governed by the exact same combination of statutes and regulations, it is a mistake to assume – even if they appear facially similar – that they can lend each other definition through comparison, or that they are decipherable under a common rubric. Rather, to ascertain the nature of an agency action, courts should ground the analysis in the idiosyncratic regime of statutes and regulations that govern it. We have great sympathy for the desire to develop a one-size-fits-all heuristic. *See, e.g., Nat'l Min*., 758 F.3d at 251 (". . . all relevant parties should instantly be able to tell whether an agency action is a legislative rule, an interpretive rule, or a general statement of policy . . . ."). But this desire is perhaps misplaced, since, as we once said of interpretation itself, agency action is "a chameleon that takes its color from its context." *American Min. Congress v. EPA*, 995 F.2d 1106, 1111 (D.C. Cir. 1993).

Accordingly, we turn first to the CAA provisions and EPA regulations that govern the Wehrum Memo.

Congress enacted the CAA, 42 U.S.C. § 7401 *et seq.*, to "protect and enhance the quality of the Nation's air

resources . . . . ” *Id.* § 7401(b)(1). Toward this end, § 112 requires EPA to regulate "Hazardous Air Pollutants," *i.e.* toxic emissions such as chloroform. *Id.* § 7412. Congress established an initial list of hazardous air pollutants, *id.* § 7412(b)(1), but the Act requires EPA to curate it, deleting or adding hazardous air pollutants over time according to certain criteria, *id.* § 7412(b)(2)-(3). Based on this list, the Act mandates EPA to create a second list of categories of sources of hazardous air pollutants, *id.* § 7412(c), like asphalt processing plants and industrial dry-cleaning facilities, *see Revision of Source Category List under Section 112 of the Clean Air Act*, 70 Fed. Reg. 37819-01 (June 30, 2005). Importantly, the Act distinguishes between "major" and "area" sources. *Id.* § 7412(a)(1)-(2). According to the Act's definitional provisions, a major source means any source within a listed category that "emits or has the potential to emit considering controls, in the aggregate, 10 tons per year or more of any [listed hazardous air pollutant] or 25 tons per year or more of any combination of [listed hazardous air pollutants]." *Id.* § 7412(a)(1). Area source means "any stationary source of [hazardous air pollutants] that is not a major source." *Id.* § 7412(a)(2).

Whether EPA classifies a source as major or area has major consequences for both sources of hazardous air pollutants, which must comply with emissions standards, and regulatory beneficiaries, who live, work, recreate – and thus regularly breathe the air – near sources of hazardous air pollutants. For major sources, the Act requires EPA to establish stringent emissions caps that result in "the maximum degree of reduction in emissions . . . (including a prohibition on such emissions, where achievable)." *Id.* § 7412(d). EPA refers to these emissions limitations as "Maximum Achievable Control Technology" ("MACT") standards. J.A. 1. The Act mandates that MACT standards be "no less stringent than the emission

control that is achieved in practice by the best controlled similar source." *Id.* § 7412(d)(3). By contrast, for area sources, EPA need not set emissions caps at all, save under limited circumstances. *See id.* § 7412(c)(3). Moreover, where the agency chooses to cap emissions for an area source, it may set emissions limits based on "Generally Available Control Technology" ("GACT") standards, which are far more lenient than their MACT counterparts.[1]

Of course, emissions caps are of little use if sources do not comply with them. Presumably in recognition of this, Congress enacted Title V of the CAA, 42 U.S.C. § 7661 *et seq.*, which makes it unlawful for a source subject to regulations under the Act – including GACT or MACT standards under § 112 – to operate without a permit, *see id.* § 7661a(a). Specifically, within a year of becoming subject to an obligation under the Act, Title V requires a source to submit a permit application and compliance plan to a state permitting authority. *Id.* § 7661b(b)-(c). In addition, a source must certify its compliance annually and submit to inspection, monitoring, and reporting requirements. *Id.* § 7661c(a)-(c). A source may apply to modify its permit, 40 C.F.R. § 70.7(e), and state permitting authorities must provide for public comment and a hearing on all permit applications that they receive, 42 U.S.C. § 7661a(b)(6).

But what if a state permitting authority issues or denies a permit application on a ground that a regulated source, or a

---

[1] As we have observed, the Act does not provide any parameters for setting GACT standards, but its legislative history describes GACT as "'methods . . . [that] are commercially available and appropriate for application . . . considering economic impacts and the technical capabilities of firms to operate and maintain the emissions control systems.'" *U.S. Sugar Corp. v. EPA*, 830 F.3d 579, 595 (D.C. Cir. 2016) (quoting S. REP. NO. 101-228, at 171 (1989)).

regulatory beneficiary believes contravenes the Act? Congress apparently foresaw this circumstance, too. Indeed, Title V provides a detailed administrative process that dictates exactly when and how regulated sources and regulatory beneficiaries may seek EPA review of a state permitting authority's action, and, ultimately, judicial review of EPA action. *See id.* § 7611d. The process works as follows. First, state permitting authorities must submit to EPA all proposed operating permits. *Id.* § 7611d(a)(1). If any permit contains a provision that the Administrator determines is not in compliance with the Act, the Administrator must object in writing, and provide a statement of reasons for the objection, within forty-five days after receiving a copy of the proposed permit. *Id.* § 7661d(b)(1). If, within ninety days of an EPA objection, a permitting authority fails to submit a revised permit that satisfies the objection, the Administrator must issue or deny the permit in accordance with the Act. *Id.* § 7661d(c). Notably, refusing to revise a permit to conform with an EPA objection does not expose a permitting authority to any sort of penalty or liability whatsoever. If the Administrator does not object in writing within forty-five days of receiving a proposed permit, any person – including a regulated source or a regulatory beneficiary – may, within sixty days after EPA's forty-five-day objection period expires, petition the Administrator to object. *Id.* § 7661d(b)(2). The Administrator must grant or deny such a petition within sixty days after it is filed. *Id.*

Importantly, for reasons that will become clear, § 7661d specifies: (1) that "[n]o objection shall be subject to judicial review until the Administrator takes final action to issue or deny a permit under this subsection," *id.* § 7661d(c); and (2) that the Administrator's denial of a petition to object "shall be subject to judicial review under section 7607," *id.* § 7661d(b)(2). In turn, § 7607 contains the Act's umbrella judicial review provision, which confers jurisdiction in the

appropriate circuit for regionally applicable final action of the Administrator and in this Court for, *inter alia*, final action of the Administrator that is "nationally applicable." *Id.* § 7607(b)(1).

With an understanding of the major statutory provisions and some of the regulations that govern the Wehrum Memo, we now provide fuller descriptions of the Wehrum Memo's predecessor, the Seitz Memo, and the Wehrum Memo itself. Where appropriate, we take care to note additional applicable CAA provisions and EPA regulations.

In 1995, without providing notice and comment, John Seitz – then Director of EPA's Office of Air Quality Planning and Standards – issued a memorandum to "clarify when a major source of [hazardous air pollutants] can become an area source" under § 112. J.A. 232 (underline in original). A major source may reclassify to an area source by limiting its potential to emit to below the major source threshold, the Seitz Memo concluded, *only until* the first date on which it must comply with a MACT standard or any other substantive regulatory requirement under the Act. *Id.* at 236. The Seitz Memo referred to this policy as "once in, always in." *Id.* In other words, under the Seitz Memo, once EPA classifies a source as major under § 112 and its first compliance date passes, the source is ineligible to reclassify as an area source, even if it takes an enforceable limit on its potential to emit to below the major source threshold. Despite EPA's stated intention to do so, *see* J.A. 234, the agency never formalized the Seitz Memo through notice and comment rulemaking. Nevertheless, the Seitz Memo has remained in effect for nearly twenty-five years.

On January 25, 2018, however, EPA announced it was reversing course. That day, William L. Wehrum, Assistant Administrator for EPA's Office of Air and Radiation, and

"principal adviser to the Administrator in matters pertaining to air and radiation programs," 40 C.F.R. § 1.41, issued a four-page memo to the agency's Regional Air Division Directors; it announced that EPA would no longer interpret § 112 in accordance with the Seitz Memo. Indeed, the Wehrum Memo explains, the agency cannot interpret § 112 in accordance with the Seitz Memo because the statute's plain-language "compels the conclusion" that a major source becomes an area source at such time when it takes an enforceable limit on its potential to emit to below the major source threshold. J.A. 1. Congress, the Wehrum Memo argues, placed no "temporal limitations" on when a major source is eligible to reclassify as an area source. *Id.* at 3. Accordingly, the Wehrum Memo declares that when a source previously classified as major limits its potential to emit to below the major source threshold, it "will no longer be subject either to the major source MACT or other major source requirements that were applicable to it as a major source under CAA section 112." *Id.* at 1. In addition, the Wehrum Memo states that it "supersedes" the Seitz Memo, *id.*, and it instructs that "[t]he Regional offices should send this memorandum to states within their jurisdiction," *id.* at 4.

## II.

Before explaining why the Wehrum Memo is not final agency action, we take a moment to clarify the proper test for finality. In this Court, its contours have become blurred amidst the "considerable smog," *Ass'n. of Flight Attendants v. Huerta*, 785 F.3d 710, 717 (D.C. Cir. 2015), enshrouding the related but separate analysis of whether an agency action is a legislative rule. In *Flight Attendants*, for example, we framed the finality inquiry as asking whether an action is "non-binding" or a "binding legislative rule," *Flight Attendant*s, 785 F.3d at 716, and we held that the guidance document at issue was nonfinal because it was "not a legislative rule carrying the

'force and effect of law,'" *id.* (quoting *Perez*, 135 S. Ct. at 1204). Likewise, in *National Mining*, we opined that in order to analyze whether an action is final, we must first "take a step back" and analyze whether the rule is a legislative rule, interpretive rule, or general statement of policy. *Nat'l Min. Ass'n*, 758 F.3d at 251-52. The most important factor in this analysis, we continued, is whether an action has "actual legal effect," *id.* at 252, and we held that the action at issue did not and was therefore unreviewable, *id.* at 252-53.

Subsuming the finality analysis within the test for whether a rule is legislative is not always inappropriate; if a rule is legislative it has the force and effect of law, and a legislative rule is thus necessarily final. As the Supreme Court has twice reminded us within the last five years, however, if a rule is final it is not necessarily legislative, and therefore the finality analysis is distinct from the test for whether an agency action is a legislative rule.

In *United States Army Corps of Engineers v. Hawkes Co.*, 136 S. Ct. 1807 (2016), the Court affirmed that the two-prong test in *Bennett v. Spear*, 520 U.S. 154 (1997), remains finality's touchstone, *see Hawkes*, 136 S. Ct. at 1813 (quoting *Bennett*, 520 U.S. at 177-78) ("First, the agency action must mark the consummation of the agency's decisionmaking process . . . . And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow."). In *Hawkes*, the question of whether the agency action at issue was the consummation of the agency's decisionmaking process was not in dispute. Accordingly, the Court's analysis focused on whether the action satisfied the second prong of *Bennett*. Notably, in undertaking this inquiry, the Court neither asked whether the action at issue had the force and effect of law nor made a single mention of legislative rules. Rather, the Court's inquiry

focused on whether the action at issue gave "rise to 'direct and appreciable legal consequences.'" *Hawkes*, 136 S. Ct. at 1814 (quoting *Bennett*, 520 U.S. at 178).

*Perez*, too, makes clear that the finality analysis is distinct from the test for whether a rule is legislative. There, the Court affirmed the "longstanding recognition that interpretive rules do not have the force and effect of law." *Perez*, 135 S. Ct. at 1208 (internal citations omitted). Accordingly, overruling *Paralyzed Veterans of Am. v. D.C. Arena L.P.*, 117 F.3d 579 (D.C. Cir. 1997), the Court held that the APA does not require an agency to provide notice and comment in amending an interpretive rule, even if the new rule deviates significantly from its predecessor. *Id.* at 1206. In so holding, the Court reassured regulated entities and regulatory beneficiaries that they are not without recourse should an agency –  perhaps to evade notice and comment – repudiate a longstanding interpretive rule by way of a second interpretive rule. *Id.* at 1209. In such a circumstance, the Court explained, an affected party can seek judicial review pursuant to the APA. *Id.* Because only final agency action is reviewable under the APA, *see* 5 U.S.C. § 704, *Perez* thus affirms that interpretive rules can be final, and, by implication, that the test for finality is independent of the analysis for whether an agency action is a legislative rule rather than an interpretive rule.

As commentators explain, maintaining an independent finality analysis is not merely a theoretical nicety; it has several salutary effects in practice. For example – as *Perez* alludes to, *see* 135 S. Ct. at 1209 – maintaining a finality analysis that is distinct from the test for whether a rule is legislative permits courts to review nonlegislative rules and thus safeguards against agencies evading both judicial review and notice and comment by acting via nonlegislative rules. *See* William Funk, *Final Agency Action After Hawkes*, 11 N.Y.U. J. L. & LIBERTY

285, 304 (2017). This is especially important when viewed from the perspective of regulatory beneficiaries, who are generally not parties to enforcement actions, and, therefore, may only be able to challenge nonlegislative rules via judicial review. *See* Nina A. Mendelson, *Regulatory Beneficiaries and Informal Agency Policymaking*, 92 CORNELL L. REV. 397, 420-24 (2007).

Having clarified the proper test for finality, we now apply it to the Wehrum Memo. Consistent with the interpretive method we endorse herein, we hew closely to the CAA provisions and EPA regulations appertaining thereto.

Our first question is whether the Wehrum Memo "mark[s] the consummation of [EPA's] decisionmaking process." *Hawkes*, 136 S. Ct. at 1813 (quoting *Bennett*, 520 U.S. at 177-78). It does. Notably, neither Respondent nor Intervenor offer substantive argument to the contrary. They were smart to save their ink. The Wehrum Memo unequivocally states that the plain language of § 112 "compels" the legal conclusion that qualifying major sources can reclassify at such time that they take an enforceable limit on their potential to emit to below the major source threshold.  J.A. 1. In other words, the Wehrum Memo does not advance what EPA believes is a reasonable interpretation of § 112; it advances what EPA believes is the *only permissible* interpretation of the statute. Moreover, no mere subordinate issued the Wehrum Memo. Far from it. The Assistant Administrator for the Office of Air and Radiation issued it. As discussed, under EPA regulations, he is the "principal advisor to the Administrator in matters pertaining to air and radiation," *see* 40 C.F.R. § 1.41, and, as we have held previously with respect to the Assistant Administrator for the Office of Air and Radiation, nothing within EPA's regulations provides us "reason to question his authority to speak for the EPA." *Her Majesty the Queen in Right of Ontario v. EPA*, 912

F.2d 1525, 1532 (D.C. Cir. 1990) (internal citations omitted). *Cf. Soundboard Ass'n. v. FTC*, 888 F.3d 1261, 1267-69 (D.C. Cir. 2018), *cert denied* 139 S. Ct. 1544, 2019 WL 1590248 (Apr. 15, 2019) (Federal Trade Commission ("FTC") staff opinion letter not consummation of agency's decisionmaking process because FTC regulations expressly delineated between Commission advice and staff advice and provided petitioners opportunity to seek opinion from Commission itself). Moreover, EPA published notice of the Wehrum Memo, and reiterated its principal conclusion, in the Federal Register. *See* 83 Fed. Reg. 5543-01 (Feb. 8, 2018). Accordingly, the Wehrum Memo can only reasonably be described as EPA's last word on when a major source can reclassify to an area source under § 112.

Because the Wehrum Memo satisfies *Bennett's* first prong, we ask next whether it has "direct and appreciable legal consequences." *Hawkes*, 136 S. Ct. at 1814 (quoting *Bennett*, 520 U.S. at 178). Petitioners argue that it does because it creates a new right – *i.e.* it allows major sources unable to reclassify to area sources under the Seitz Memo to so reclassify. Cal. Pet'rs' Br. 17-20. Respondent counters that the Wehrum Memo does not change the rights of regulated sources. EPA Br. 26-28. Whether or not a regulated source has the right to reclassify, Respondent contends, is only determined within the Title V permitting process. *Id.* (citing 42 U.S.C. § 7661d).

For reasons now explained, we hold that the Wehrum Memo does not have a single direct and appreciable legal consequence.

*Hawkes* instructs that whether an agency action has direct and appreciable legal consequences is a "'pragmatic'" inquiry. *Id.* at 1815 (quoting *Abbot Labs. v. Gardner*, 387 U.S. 136, 149

(1967)). In characterizing the inquiry as pragmatic, we do not take the Court to be encouraging some sort of common-sense approach. Quite the opposite. We take it as counseling lower courts to make *Bennett* prong-two determinations based on the concrete consequences an agency action has or does not have as a result of the specific statutes and regulations that govern it. Thus, in *Hawkes*, the Court held, in part, that the agency determination at issue had direct and appreciable legal consequences because, under the applicable statutes and regulations, if petitioners failed to heed the determination they did so at the risk of significant criminal and civil penalties. *Id*. And the cases *Hawkes* relies on as past examples of the "pragmatic approach [the Court] has long taken to finality" hold similarly. *Id.* (citing and quoting *Sackett v. EPA*, 566 U.S. 120, 126 (2012) (holding that agency action at issue satisfied *Bennett* prong-two because, under the relevant statutes and regulations, it appeared to expose petitioners to double penalties in a future enforcement proceeding and to limit their ability to obtain a certain type of permit); *Abbot Labs.*, 387 U.S. at 152 (holding that action at issue had a "sufficiently direct and immediate" impact on petitioners, such that judicial review was appropriate, because, under the governing statutes and regulations, noncompliance risked "serious criminal and civil penalties"); *Frozen Food Express v. United States*, 351 U.S. 40, 44 (1956) (same)).

Quite recently, in *Valero Energy Corporation v. EPA*, No. 18-1028, 2019 WL 2587837 (D.C. Cir. June 25, 2019), we affirmed this approach. At issue there, like here, was whether an EPA guidance document that declared the agency's interpretation of a statute was final under the Act. We held that it was not. Assessing it within the context of the Act, we emphasized that: (1) the guidance imposed no obligations, prohibitions, or restrictions; (2) it put no party to the choice between costly compliance and the risk of a penalty of any sort;

(3) EPA acknowledged at oral argument that the guidance had no independent legal authority; and (4) that the Act provided regulated parties a statutory mechanism by which to challenge any EPA action that was premised on the statutory interpretation that the guidance advanced. *Valero*, 2019 WL at *3-5.

Assessing the Wehrum Memo under *Hawkes* and in accordance with *Valero*, we find that it is not final. True, it unequivocally declares that major sources, at such time that they limit their potential to emit to below the major source threshold, "will no longer be" subject to MACT standards. J.A. 1. Viewed within the context of the Act, however, the Wehrum Memo is all bark and no bite. As Respondent averred twice at oral argument, neither EPA nor any regulated source can rely on the Wehrum Memo within the Title V permitting process or in any other proceeding. Oral Arg. 50:15-50:27, 1:01:13-1:01:50. In other words, as Respondent concedes, although the Wehrum Memo forecasts EPA's position as to § 112, it has no independent legal authority. In addition, under the Act and EPA regulations, a state permitting authority that refuses to comply with the Wehrum Memo faces no penalty or liability of any sort. Further still, the instant matter does not present a circumstance where the action at issue may be legally consequential because its binds agency staff and affected parties have no means (outside of judicial review) by which to challenge it. To the contrary, the Act contains clear provisions pursuant to which: (1) a state permitting authority can refuse to apply the Wehrum Memo and seek judicial review if EPA issues a permit over its refusal, *id.* § 7661d(c); and (2) a regulatory beneficiary can petition EPA to object to a state permitting authority's application of the Wehrum Memo and seek judicial review if EPA denies the petition, *id.* § 7661d(b)(2).

Accordingly, although the Wehrum Memo, in no uncertain terms, forecasts EPA's definitive interpretation of § 112, it has no direct and appreciable legal consequences: neither EPA nor regulated sources can rely on it as independently authoritative in any proceeding; state permitting authorities face no penalty or liability of any sort in ignoring it; and state permitting authorities and regulatory beneficiaries have clear statutory avenues by which to challenge a permitting decision adopting the reasoning of the Wehrum Memo and seek judicial review if EPA fails to sustain their challenges. Under § 7661d(c), if a state permitting authority refuses to issue a permit allowing a major source to reclassify as an area source, and EPA subsequently issues such a permit following the reasoning of the Wehrum Memo, judicial review is appropriate. Under § 7661d(b)(2), if EPA, following the reasoning of the Wehrum Memo, denies a petition from any person asking the agency to object to a state permitting authority's issuance of a permit that allows a major source to reclassify as an area source, judicial review is appropriate. Indeed, because Congress specified that "[n]o objection shall be subject to review until the Administrator takes final action to issue or deny a permit under this subsection," § 7661d(c), we would contravene Congressional intent if we were to hold that a memo that merely forecasts a future objection is final agency action and subject to judicial review at this time.

The dissent insists that the Wehrum Memo satisfies *Bennett*'s second prong because it "altered the legal regime." Dis. Op. 12. Indeed, the dissent forewarns, the Wehrum Memo "commands, orders, and dictates [to]" EPA employees, *id.* at 4, and "state permitting authorities are subject to" the statutory interpretation it advances, *id.* Said differently, according to the dissent, because of the Wehrum Memo, sources subject to MACT standards that limit their potential to emit to below the major source threshold are now "*assured* that they will be

subject to decreased regulation with EPA's support." *Id.* at 12 (emphasis added).

While the question is not free from doubt, we respectfully disagree. As noted above, we must remain laser focused on whether the Wehrum Memo gives "rise to 'direct and appreciable legal consequences.'" *Hawkes*, 136 S. Ct. at 1814 (quoting *Bennett*, 520 U.S. at 178), and when viewed in its specific regulatory context, it does not. "[M]ajor sources must comply with technology-based emission standards requiring the maximum degree of reduction in emissions EPA deems achievable, . . . [and] [i]n order to obtain an operating permit under title V of the [CAA], major sources must comply with extensive monitoring, reporting and record-keeping requirements. *Nat'l Min. Ass'n v. U.S. E.P.A.*, 59 F.3d 1351, 1353 (D.C. Cir. 1995). Major sources must obtain a permit in order to operate, and unless and until that permit is amended or set aside, the stringent requirements set forth therein must be complied with while that equipment is operational. The Wehrum Memo itself does not revoke or amend a single permit. As acknowledged by the Ohio environmental authorities in materials cited by petitioners, "[i]f you want to take advantage of the new guidance [in the Wehrum Memo], you will need to submit an application to modify your current permit." Environmental Pet'rs' Br., Standing Addendum 0198. Assuredly, although the Wehrum Memo advises EPA employees of the agency's position as to § 112, it does not bind state permitting authorities or assure regulated entities of the ability to reclassify. As EPA concedes, EPA Br. 21, 25, in receiving such an application to modify a permit, a state permitting authority may – with total impunity – ignore the Wehrum Memo and deny the application. It is true that the Administrator must issue a revised permit over the state permitting authority's protest if he or she believes that the statute so requires, § 7661d(c), but in such a case, the statute

explicitly provides the state permitting authority a mechanism by which to seek judicial review of the Administrator's action. *Id.* Regardless of whether Congress generally intended to allow pre-enforcement review of guidance documents under some circumstances in the CAA, here, as described above, Congress specifically directed that judicial review shall not be available until the Title V permit amendment process reaches a conclusion, *see* §§7661d(b)(2), 7661d(c). Congress' explicit understanding of finality in this specific statutory context controls our consideration of the instant guidance document, which pertains to that same permit amendment process.

\*\*\*

Before concluding, we note that we have twice had occasion to ask whether an EPA guidance document that implicated the Act's Title V permitting process was final agency action: first in *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1021 (D.C. Cir. 2000), then in *National Environmental Development Ass'n v. EPA*, 752 F.3d 999 (D.C. Cir. 2014). In each, we found that the guidance at issue was final. A brief analysis of our reasoning in those cases demonstrates why the Wehrum Memo is not.

In *Appalachian Power*, at issue was a nineteen-page guidance document relating to certain monitoring requirements for Title V sources. *Appalachian Power*, 208 F.3d at 1019-20. In assessing our jurisdiction over the guidance, we did not consider § 7611d. Instead, we framed our jurisdiction solely in terms of § 7607(b)(1). *See id.* at 1021 n. 10 ("Our jurisdiction extends to 'any . . . nationally applicable . . . final action taken by,' the EPA 'Administrator.'") (quoting 42 U.S.C. § 7607(b)(1))). We predicated our holding that the guidance was final on the following findings. First, we found that it required state permitting authorities to: (1) "review their

emission standards and the emission standards EPA has promulgated to determine if the standards provide enough monitoring;" and (2) "insert additional monitoring requirements as terms or conditions of a permit . . . if they believe existing requirements are inadequate, as measured by EPA's multi-factor, case-by-case analysis set forth in the Guidance." *Id.* at 1022. Second, we found that EPA did not dispute petitioners' assertion that state permitting authorities were relying on EPA's guidance in insisting that regulated sources utilize a monitoring method that was more burdensome than the monitoring method set out under existing EPA regulations. *Id.* at 1023 & n.17. Finally, we found that a challenge to an individual permit applying the guidance would not be heard in this Court, presumably because we felt any such challenge would have only regional implications. *Id.* at 1023 n. 18.

In *National Environmental*, the guidance document before us explained that, due to a decision of the Sixth Circuit, EPA was altering a certain interpretation of its regulations only for Title V sources located within the Sixth Circuit's jurisdiction. *Nat'l Envtl.*, 752 F.3d at 1003. As in *Appalachian Power*, in assessing our jurisdiction over the guidance, we asked only whether it was final under § 7607(b)(1) and made no mention of § 7661d. *Id.* at 1006. In holding that it was final, we found that the "finality and legal consequences" of the guidance "were made plain" when EPA "relied on [it]" in approving a Federal Implementation Plan ("FIP") "involving a company located outside the jurisdiction of the Sixth Circuit." *Id.* at 1007 (citing 78 Fed. Reg. 17836, 17842 & n. 10 (March 22, 2013)). Indeed, within the FIP approval – which is a final, legislative rule carrying the force and effect of law – EPA cited the guidance as the sole authority for the legal conclusion that certain regulations applied to certain sources located outside of

the  Sixth Circuit's jurisdiction. *See* 78 Fed. Reg. 17836, 17842 & n.10 (March 22, 2013)

*Appalachian Power* and *National Environmental* are thus, contrary to what the dissent suggests, *see* Dis. Op. 2-3, distinct from the instant matter in a crucial respect. In those cases, we held that the guidance documents at issue were final under § 7607(b)(1), without reference to § 7661d, because EPA and state permitting authorities wielded them to effectuate legal consequences. In *Appalachian Power*, we found that the guidance at issue required state permitting authorities to take at least two specific actions and that EPA did not deny that state permitting authorities used it to coerce regulated sources to adopt a stricter monitoring method. In *National Environmental*, we found that EPA cited the guidance, within a binding FIP approval, as the sole authority in support of a legal conclusion. By contrast, the Wehrum Memo does not require any entity or person to do anything, and EPA concedes that it has not, will not, and cannot rely on it in any proceeding. Accordingly, unlike in *Appalachian Power* and *National Environmental*, we have no basis to conclude, without reference to § 7661d, that we have jurisdiction over the guidance before us under § 7607(b)(1). We note, in addition, that in *Appalachian Power*, we found that we would lack jurisdiction over challenges to permitting decisions applying the guidance at issue. Here, however, any party entitled to review under § 7661d that wishes to challenge an application of the Wehrum Memo in this Court will be so heard, since the Wehrum Memo's principal conclusion is nationally applicable. *See* § 7607(b)(1).

In sum, we find that the Wehrum Memo – assessed within the context of the Act and EPA regulations – is not final agency action, and we dismiss the petitions for lack of subject matter jurisdiction under the Act. The Wehrum Memo marks the consummation of EPA's decisionmaking process as to when a

major source may reclassify to an area source under § 112. But the Wehrum Memo does not have direct and appreciable legal consequences: it does not require anyone to do anything; neither EPA nor regulated sources can rely on it in any proceeding; state permitting authorities face no penalty or liability in ignoring it; state permitting authorities and regulatory beneficiaries have clear statutory avenues by which to challenge it and seek judicial review if EPA refuses to heed their challenges; and any such challenges, if so desired, will be heard in this Court.

## III.

To conclude, we note that we are under no illusion that this opinion will be the Rosetta Stone of understanding the nature of agency action. Developing this area of the law is indeed an "important continuing project." *Nat'l Min. Ass'n*, 758 F.3d at 251. Nonetheless, today we humbly submit our contribution toward clarifying this somewhat gnarled field of jurisprudence. In ascertaining the nature of an agency action, we emphasize, courts should look first to the matrix of statutes and regulations governing that specific action. In addition, we offer a gentle reminder that the finality analysis is *sui generis*, separate and distinct from the test for whether an agency action is a legislative rule.

*So ordered.*

ROGERS, *Circuit Judge*, dissenting: On February 8, 2018, EPA formally announced in the Federal Register that "the plain language of the definitions of 'major source'. . . and of 'area source' in Section 112 of the [Clean Air Act] *compels* the conclusion that a major source becomes an area source at such time that the source takes an enforceable limit on its potential to emit [] hazardous air pollutants [] below the major source thresholds . . . ." 83 Fed. Reg. 5543 (Feb. 8, 2018) (emphasis added). "In such circumstances, a source that was previously classified as major . . . will no longer be subject either to the major source [maximum achievable control technology] or other major source requirements that were applicable to it as a major source under CAA section 112." *Id.* Further, EPA stated this guidance memorandum "supersedes" the prior guidance in the May 1995 Seitz memorandum barring such reclassifications. *Id.* The guidance memorandum referred to in the Federal Register Notice was issued under the signature of William L. Wehrum, EPA Assistant Administrator for the Office of Air and Radiation. Petitioners now seek pre-enforcement review of the Wehrum Memorandum pursuant to 42 U.S.C. § 7607(b)(1), contending that the guidance memorandum is a legislative rule issued without notice and comment.

## I.

Section 7607(b)(1) provides that this court shall have jurisdiction to review nationally applicable "final action taken" by the Administrator of EPA. 42 U.S.C. § 7607(b)(1). The term "final action" in Section 7607(b)(1) is synonymous with "final agency action" in the Administrative Procedure Act ("APA"), 5 U.S.C. § 704. *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 478 (2001). The finality inquiry itself is governed by the test articulated in *Bennett v. Spear*, 520 U.S. 154 (1997). *Sackett v. EPA*, 566 U.S. 120, 126–27 (2012). An agency action is final if: (1) the action marks the "consummation of the agency's decisionmaking process," and

(2) the action is one "by which rights or obligations have been determined, *or* from which legal consequences *will* flow." *Bennett*, 520 U.S. at 177–78 (internal quotation marks and citation omitted) (emphases added).

The Supreme Court has "characterized the special judicial review provision of the CAA, 42 U.S.C. § 7607(b), as one of those statutes that specifically provides for 'preenforcement' review." *Whitman*, 531 U.S. at 479 (citing *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726 (1998)). In addressing ripeness, the Court has pointed out that the CAA "permit[s] 'judicial review directly, even before the concrete effects normally required for APA review are felt.'" *Id*. at 479–80 (quoting *Lujan v. National Wildlife Federation*, 497 U.S. 871, 891 (1990)). This court, in turn, recognized that "Congress has emphatically declared a preference for immediate review with respect to Clean Air Act rulemaking," *NRDC v. EPA*, 643 F.3d 311, 320 (D.C. Cir. 2011) (internal quotations and citations omitted), which is what petitioners contend the Wehrum Memorandum is. So understood, the statutory scheme not only allows but encourages pre-enforcement review of final actions such as the Wehrum Memorandum.

## A.

The court has repeatedly held that judicial review is available pursuant to Section 7607(b)(1) for guidance documents that bind EPA officials on how to make Title V permitting decisions.

In *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1020 (D.C. Cir. 2000), the court considered a guidance document instructing that a source's Title V permit must include periodic monitoring requirements to ensure compliance with certain federal or state standards. The guidance document thus reflected "a position [EPA] plans to follow in reviewing State-

issued permits" and "a position EPA officials in the field are bound to apply." *Id.* at 1022. The court explained that the guidance document had legal consequences for both enforcement officials and regulated entities because it "reads like a ukase. It commands, it requires, it orders, it dictates." *Id.* at 1023. The court held that the guidance document was a final action over which the court had jurisdiction pursuant to Section 7607(b). *Id.* at 1022–23 & n.10.

Also, in *National Environmental Development Ass'n's Clean Air Project v. EPA*, 752 F.3d 999, 1007 (D.C. Cir. 2014), this court held that a guidance document on how EPA would determine whether groups of activities qualified as a "single stationary source" or multiple sources in Title V permits was a final action. The guidance document had legal consequences, the court explained, because it "provides firm guidance to enforcement officials about how to handle permitting decisions" and "*compels* agency officials" to apply certain permitting standards. *Id.* (emphasis in original). The court held that the guidance was "final agency action that is subject to judicial review" pursuant to Section 7607(b)(1). *Id.* at 1006–07.

Similarly, in the context of review of state implementation plans required by the CAA, the court held in *Natural Resources Defense Council*, 643 F.3d at 320, that a guidance document that "definitively interpreted" a provision of the CAA "altered the legal regime" because it required EPA officials to consider alternatives to a specific program when reviewing state implementation plans. The court explained that the guidance "binds EPA regional directors and thus qualifies as final." *Id.*

In sum, the court has repeatedly held that guidance documents, which on their face bind enforcement officials to apply a certain standard or interpretation under the CAA,

4

including in the Title V context, are final actions subject to review pursuant to Section 7607(b)(1).

The Wehrum Memorandum states the law that EPA officials must apply in Title V permitting. Addressed to EPA Regional Air Division Directors, the Wehrum Memorandum "provides firm guidance to enforcement officials about how to handle permitting decisions." *Nat. Envmtl. Dev.*, 752 F.3d at 1007. By its express terms, the Wehrum Memorandum unequivocally provides the interpretation of Section 112 that is to be applied by EPA employees. *See NRDC*, 643 F.3d at 320. The Wehrum Memorandum explains that the plain text of Section 112 "*compels* the conclusion that a major source becomes an area source at such time that the source takes an enforceable limit on its potential to emit . . . below major source thresholds." *Wehrum Memorandum* at 1 (emphasis added). Referencing its legal consequences, the Wehrum Memorandum instructs that upon taking such a limit on its potential to emit below the major source thresholds, a source "*will not* be subject thereafter to those requirements applicable to the source as a major source under CAA section 112." *Id.* at 4 (emphasis added). Like the guidance document in *Appalachian Power*, 208 F.3d at 1023, the Wehrum Memorandum "reads like a ukase." It commands, orders, and dictates without caveats or disclaimers about the binding nature of its statutory interpretation. *Compare id.*, *with Nat. Mining Ass'n v. McCarthy*, 758 F.3d 243, 252–53 (D.C. Cir. 2014). It expressly "supersedes" EPA's prior interpretation, stating that the Seitz Memorandum is withdrawn, "effective immediately." *Wehrum Memorandum* at 1.

Under the statutory scheme, state permitting authorities are subject to the statutory interpretation announced in the Wehrum Memorandum stating EPA's unequivocal position. The Wehrum Memorandum directs EPA enforcement officials

to send the memorandum to the States and thereby, in light of the Federal Register Notice, puts States doubly on notice that EPA's interpretation of Section 112 has changed, effective immediately. Given the text, structure, and purpose of the CAA, state permitting authorities are not free to ignore EPA's new interpretation of Section 112. The statutory scheme is based on a partnership between federal and state governments, whereby EPA sets federal standards and States develop implementation plans to set emissions limitations and standards to conform to these federal standards. *Appalachian Power*, 208 F.3d at 1019. "Typically, EPA delegates to the States its authority to require companies to comply with federal standards." *Id*. The terms and conditions in permits issued under Title V incorporate the applicable federal standards for individual sources. *Id.* Reinforcing that States must act in conformity with the Wehrum Memorandum, the CAA prohibits the Administrator of EPA from approving a state implementation plan under Title V except "to the extent that the program meets the requirements of [the CAA]." 42 U.S.C. § 7661a(d)(1). If a State proposes to issue an individual permit that does not comply with the CAA requirements, then the Administrator "shall" object. *Id.* § 7661d(b)(1). The Administrator is authorized to modify an individual permit. *Id.* § 7661d(e). The CAA even contemplates that a state permitting authority can be sanctioned for not adequately administering and enforcing a program. *Id.* § 7661a(i).

In sum, by announcing an unequivocal interpretation of which federal standards apply to which sources under the CAA, "EPA expects States to fall in line." *Appalachian Power*, 208 F.3d at 1023. Through the Wehrum Memorandum, EPA has instructed its employees that the plain text of the CAA includes no temporal limitation on the reclassification of "major sources." By publicly announcing an unequivocal statement that the plain text of the CAA "compels" its conclusion, EPA

has given States their "marching orders" to allow reclassification of major sources. *Id.* And States have heeded EPA's direction. *See, e.g.*, Kuiken Decl. ¶¶ 6, 11 & Att.; McCloud Decl. ¶¶ 6, 10 & Att.; Gharrity Decl. Att. (Ohio EPA publication providing guidance to regulated entities treating the Wehrum Memorandum as binding); *see also* Standing Add. 43, 45, 48, 52–53, 57, 275.

Therefore, under this court's precedent issuance of the Wehrum Memorandum is final action subject to judicial review pursuant to Section 7607(b)(1) because it provides EPA's unequivocal interpretation on the reclassification of "major sources," thereby binding EPA enforcement officials.

**B.**

Contrary to the court's conclusion, the Wehrum Memorandum is final action under the two-prong *Bennett v. Spear* test. 520 U.S. at 177–78. First, the Wehrum Memorandum marks the consummation of EPA's decisionmaking process with respect to its interpretation of whether Section 112 of the CAA allows major sources to reclassify as area sources at any time. The Wehrum Memorandum is unequivocal — if a major source "takes an enforceable limit on its potential to emit . . . below the major source thresholds," the CAA "compels" that the source can reclassify as an area source at that time. *Wehrum Memorandum* at 1. It states the official position of the EPA Administrator; in signing the guidance memorandum, the Assistant Administrator for the Office of Air and Radiation was acting on behalf of the Administrator. *See* 40 C.F.R. § 1.41; *Her Majesty the Queen in Right of Ontario v. EPA*, 912 F.2d 1525, 1532 (D.C. Cir. 1990). Addressed to the Regional Air Division Directors, it instructs the Regional offices on what Section 112 of the CAA "compels," and to "send this memorandum to states within their jurisdiction." *Id.* at 4. By

Federal Register Notice, EPA announced to the public it had abandoned its prior interpretation and now concluded the plain text of Section 112 imposed no temporal limit on reclassifications by "major sources." 83 Fed. Reg. at 5543. Regardless of whether EPA may change its position in the future, *see, e.g.*, *Gen. Elec. Co. v. EPA*, 290 F.3d 377, 380 (D.C. Cir. 2002); *Appalachian Power*, 208 F.3d at 1022, the Wehrum Memorandum marks EPA's unequivocal statutory interpretation of whether "major sources" may, at any time, reclassify under the CAA upon limiting their potential to emit hazardous pollutants.

Second, the Wehrum Memorandum is an action "from which legal consequences *will* flow" because it announces a binding change in the legal regime. *Bennett*, 520 U.S. at 178 (emphasis added); *see also U.S. Army Corps of Engineers v. Hawkes Co.*, 136 S. Ct. 1807, 1814–15 (2016); *NRDC*, 643 F.3d at 319–20; *Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 427 (D.C. Cir. 2004); *Appalachian Power*, 208 F.3d at 1020–21. The Wehrum Memorandum alters the legal regime by changing the regulatory requirements for any "major source" that "takes an enforceable limit on its potential to emit . . . below major source thresholds." *Wehrum Memorandum* at 1. Those sources now have the opportunity to reclassify as area sources at any time by limiting their potential to emit below major source thresholds and thereafter will not be subject to the more onerous major source requirements, such as the Maximum Achievable Control Technology standards.

The court's recent decision in *Valero Energy Corp. v. EPA*, 927 F.3d 532 (D.C. Cir. 2019) reaffirms that legal consequences will flow from the Wehrum Memorandum. There, the court held legal consequences did not flow from a guidance document that interpreted EPA's duty to conduct "periodic reviews" of renewable fuel standards under 42

U.S.C. § 7545(o)(11) and explained how EPA's prior actions fulfilled any statutory duty to conduct periodic reviews. *Id.* at 535. The document did not purport bind EPA to its interpretation and had no identifiable effect on the regulated community. *Id.* at 536–37. Here, in contrast, the Wehrum Memorandum announces a binding interpretation that has an identifiable effect on major sources that take enforceable limits on their potential to emit below major source thresholds.

EPA's contrary position, that the Wehrum Memorandum is not final because it has no immediate impact or direct legal consequences for specific sources, misstates the finality test. "The test for finality . . . is not so narrow — it is met if 'the action [is] one by which rights or obligations have been determined, or from which legal consequences *will* flow.'" *Harris v. FAA*, 353 F.3d 1006, 1011 (D.C. Cir. 2004) (quoting *Bennett*, 520 U.S. at 178) (emphasis added). The court's suggestion that the Wehrum Memorandum is "all bark and no bite," Op. 16, ignores its plain text as well as the second clause of the second prong of the *Bennett v. Spear* test. With EPA's blessing, legal consequences will flow from the Wehrum Memorandum no later than when "major sources" take enforceable limits on their potential to emit below "major source" thresholds and obtain new or modified Title V permits. Indeed, such legal consequences have already occurred; EPA acknowledged that at least two "major sources" in Indiana have reclassified as area sources as of filing of the briefs in the instant appeal, and the Sierra Club has identified numerous other "major sources" that are eligible to reclassify. Resp't's Br. 29; Kuiken Decl. ¶ 6 & Att.; McCloud Decl. ¶ 5 & Att.

Additionally, the opportunity for judicial review at a later time has no direct bearing on the availability of pre-enforcement review of the Wehrum Memorandum. Section 7661d provides for judicial review under Section 7607 of an

Administrator's objection or denial of a petition to object to a specific Title V permit for a specific source. 42 U.S.C. § 7661d(b). Petitioners are not challenging a source-specific objection. Instead, they seek review of a generally applicable guidance document pursuant to Section 7607(b), which provides for judicial review of such a general guidance document that is a "final action." *Id.* § 7607(b)(1). The two provisions for judicial review serve different purposes. Judicial review of national standards at the start of the regulatory process can ensure that Congress's intent is being carried out before States and the regulated community must take costly implementing actions, while later enforcement review can ensure compliance with terms and conditions in individual permits. Nothing in the text, structure, purpose, or legislative history of the CAA indicates the availability of review of a decision in a source-specific Title V proceeding under Section 7661d would preclude pre-enforcement review of a general guidance document under Section 7607(b). That both exist in the CAA is a rational approach for complex legislation where Congress intended to bring about significant changes to the *status quo* impacting the environment, the public, and entities emitting hazardous air pollutants. *See Appalachian Power*, 208 F.3d at 1017; *see generally* Hon. Henry A. Waxman, *An Overview of the Clean Air Act Amendments of 1990*, 21 ENVTL. L. 1721, 1723, 1742 (1991). Put otherwise, the provision of judicial review of Title V permit decisions "in one section of a long and complicated statute" is hardly sufficient to overcome Congress's decision to provide pre-enforcement review. *See Sackett*, 132 S. Ct. at 1373. Not only does nothing in the text of Section 7661d override the provision for pre-enforcement review under Section 7607(b), the Supreme Court has acknowledged the CAA encourages pre-enforcement judicial review. *See Whitman*, 531 U.S. at 479 (quoting *Ohio Forestry*, 523 U.S. at 737); *see also NRDC*, 643 F.3d at 320.

Furthermore, Congress's express purpose in enacting the CAA was "to promote the public health and welfare and the productive capacity of [the Nation's] population." 42 U.S.C. § 7401(b)(1). Delaying the opportunity for judicial review until individual source permit enforcement proceedings could effectively squelch the opportunity for regulatory beneficiaries to obtain judicial review of an agency's position. *See* Nina A. Mendelson, *Regulatory Beneficiaries and Informal Agency Policymaking*, 92 CORNELL L. REV. 397, 420–24 (2007) ("Mendelson"). Title V does provide regulatory beneficiaries the opportunity to file a petition to object and to seek judicial review of denial of a petition to object in individual permitting proceedings. 42 U.S.C. § 7661d(b)(2). Yet requiring regulatory beneficiaries to monitor and to file petitions in individual permit proceedings throughout the United States requires resources that may constrain beneficiaries' ability to seek judicial review. *See* Mendelson at 451–52. Pre-enforcement judicial review of a nationally applicable guidance document, in contrast, is more accessible for regulatory beneficiaries. Precluding pre-enforcement review would impose a burden Congress has not required.

Notably, irrelevant to the finality inquiry is the fact that the Wehrum Memorandum is deregulatory rather than regulatory. This is the fallacy underlying the court's efforts to distinguish our precedent on the basis that the Wehrum Memorandum does not require anyone to do anything. *See* Op. 21. Although the Supreme Court and this court have regularly been confronted with challenges to regulatory actions as too strong or too weak and held that agency actions that require parties to take certain actions or expose parties to penalties are final, *see, e.g.*, *Hawkes,* 136 S. Ct. at 1814–15; *Sackett*, 566 U.S. at 126; *Nat. Mining Ass'n*, 758 F.3d at 252; *CSI Aviation Servs., Inc. v. DOT*, 637 F.3d 408, 412–13 (D.C. Cir. 2011), the focus of the

inquiry has been on whether the legal regime has changed. The Wehrum Memorandum changed the legal regime by enabling certain regulated entities to become subject to decreased regulation — an opportunity not clearly available under the CAA, much less under EPA's prior interpretation. Prior to EPA's issuance of guidance, enforcement officials had discretion to interpret the CAA as either allowing or prohibiting "major source" reclassification after the first compliance date. *See NRDC*, 643 F.3d at 319–20. Now that discretion has been withdrawn as regulated "major sources" are eligible to be reclassified at any time upon taking emissions limitations.

Further, the Supreme Court has held that legal consequences can flow from the "denial of a safe harbor." *Hawkes*, 136 S. Ct. at 1814. In *Scenic America, Inc. v. DOT*, 836 F.3d 42, 56 (D.C. Cir. 2016), this court recognized that legal consequences would flow from a guidance document that created a safe harbor whereby digital billboard permits would not be denied on the basis of violating certain standards. And in determining whether a document was a "rule" under the Toxic Substance Control Act in *General Electric*, 290 F.3d at 384–85, this court held that a guidance document that "appears to bind [EPA] to accept applications using a total toxicity factor of 4.0 (mg/kg/day)$^{-1}$" imposed binding obligations, explaining that "if the language of the document is such that private parties can rely on it as a norm or safe harbor by which to shape their actions, it can be binding as a practical matter." *Id.* at 383 (quoting Robert A. Anthony, *Interpretive Rules, Policy Statements, Guidances, Manuals, and the Like—Should Federal Agencies Use Them to Bind the Public?*, 41 DUKE L.J. 1311, 1328–29 (1992)). The Wehrum Memorandum creates a safe harbor for "major sources" by removing a prior barrier to reclassification — those sources that take an enforceable limit on their potential to emit below the "major source" threshold

are assured that they will be subject to decreased regulation with EPA's support. This safe harbor has a "clear legal effect on regulated entities." *See Scenic America*, 836 F.3d at 56.

For these reasons, the Wehrum Memorandum is final action, reviewable pursuant to Section 7607(b)(1). It is an agency action with the telltale signs of finality — it presents a unequivocal interpretation of requirements under the CAA; it is binding on its face; and it altered the legal regime by providing an opportunity for "major sources" that take enforceable limits on their potential to emit below the "major source" thresholds to reclassify as "area sources" at any time. "Once the agency publicly articulates an unequivocal position . . . and expects regulated entities to alter their primary conduct to conform to that position, the agency has voluntarily relinquished the benefit of postponed judicial review." *Ciba-Geigy Corp. v. EPA*, 801 F.3d 430, 436 (D.C. Cir. 1986).

## II.

The question remains whether the Wehrum Memorandum is an agency action ripe for review. To decide whether an agency's action is ripe for review, courts generally consider the "fitness of the issues for judicial decision" and the "hardship to the parties of withholding court consideration." *Ohio Forestry*, 523 U.S. at 733 (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967)). In *Appalachian Power*, 208 F.3d at 1023 n.18, the court held that a guidance document that reflected EPA's settled position regarding periodic monitoring requirements in Title V permits was ripe for review because the propriety of EPA's statutory interpretation would "not turn on the specifics of any particular permit." *Id.* EPA's guidance document was "national in scope and Congress clearly intended this court to determine the validity of such EPA actions," *see* 42 U.S.C. § 7607, yet "[a] challenge to an

individual permit would not be heard in this court," *Appalachian Power*, 208 F.3d at 1023 n.18.

The same is true here. Whether EPA was required, as petitioners contend, to promulgate the Wehrum Memorandum through notice-and-comment rulemaking and whether EPA's statutory interpretation in the Wehrum Memorandum is proper will not turn on the specifics of any particular permit. EPA has announced that "a major source that takes an enforceable limit on its [potential to emit] . . . no matter when the source may choose to take measures to limit its [potential to emit] . . . *will not* be subject thereafter to those requirements applicable to the source as a major source under CAA section 112." *Wehrum Memorandum* at 4 (emphasis added). Its guidance is national in scope, as the court looks only to the face of an agency action to determine whether the action is nationally applicable. *Dalton Trucking, Inc. v. EPA*, 808 F.3d 875, 881 (D.C. Cir. 2015); *Am. Road & Trans. Builders Ass'n v. EPA*, 705 F.3d 453, 456 (D.C. Cir. 2013). Any objection or denial of a petition to object to a Title V permit would apply solely to the specific source applying for the Title V permit; inclusion of a general statutory interpretation that may apply as precedent in future Title V permit proceedings would not render the action nationally applicable under 42 U.S.C. § 7607(b)(1). *See Sierra Club v. EPA*, 926 F.3d 844, 849–50 (D.C. Cir. 2019). Concluding that petitioners' challenges are not ripe until the Wehrum Memorandum is applied in an individual Title V permit proceeding would frustrate Congress's intent that "nationally applicable" actions such as the Wehrum Memorandum be reviewable in this court pursuant to 42 U.S.C. § 7607(b)(1). Under the court's approach, challenges would instead be directed to appropriate regional courts. *See* Op. 16–17; *see e.g.*, *Sierra Club*, 926 F.3d at 847–50.

14

In any event, petitioners' challenges are fit for judicial review because they present purely legal issues. *See Nat. Envtl. Dev.*, 752 F.3d at 1008; *Gen. Elec.*, 290 F.3d at 380. Whether Section 112 of the CAA allows "major sources" to reclassify as "area sources" at any time upon taking enforceable limits on their potential to emit is a question of statutory interpretation that will not benefit from further factual development. *See Ohio Forestry*, 523 U.S. at 733. Given EPA's conclusion that the plain text "compels" the interpretation in the Wehrum Memorandum, this is not a circumstance in which judicial review would hinder EPA's effort to refine its position. *See id.* at 735. Nor will petitioners' claims under the APA be affected by further factual development. *See Gen. Elec.*, 290 F.3d at 380. In view of Congress's stated preference for immediate review under the CAA, *NRDC*, 643 F.3d at 320, the court need not consider hardship to the parties of delaying review, *see Cement Kiln Recycling Coal. v. EPA,* 493 F.3d 207, 215 (D.C. Cir. 2007); *Gen. Elec.*, 290 F.3d at 381. As noted, the CAA is a statute that "permit[s] judicial review directly, even before the concrete effects normally required for APA review are felt." *Whitman*, 531 U.S. at 479 (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S, 871, 891 (1990)).

**III.**

The APA requires that a legislative rule, which carries the "force and effect of law," *Ass'n of Flight Attendants-CWA, ARL-CIO v. Huerta*, 785 F.3d 710, 716 (D.C. Cir. 2015) (quoting *Perez v. Mortgage Bankers Ass'n*, 135 S. Ct. 1199, 1204 (2015)), must be promulgated pursuant to notice-and-comment rulemaking. *Id.* To determine whether agency action carries the force and effect of law, the court generally looks to the actual legal effect (or lack thereof) of the agency action, paying particular attention to the express words used in the document. *Flight Attendants*, 785 F.3d at 717; *Nat. Mining*,

758 F.3d at 252. "[A] document that reads like an edict is likely to be binding, while one riddled with caveats is not." *Flight Attendants*, 785 F.3d at 717. The court also considers whether the action was published in the Federal Register or the Code of Federal Regulations, and whether the action has binding effects on the agency or private parties. *Ctr. for Auto Safety v. Nat. Highway Traffic Safety Admin.*, 452 F.3d 798, 806–07 (D.C. Cir. 2006) (citing *Molycorp, Inc. v. EPA*, 197 F.3d 543, 545 (D.C. Cir. 1999)); *see also Flight Attendants*, 785 F.3d at 717; *Nat. Mining*, 758 F.3d at 252. An agency's adoption of a binding norm that could not be properly promulgated absent the notice-and-comment rulemaking required by the APA "obviously would reflect final agency action." *Ctr. for Auto Safety*, 452 F.3d at 804; *see also Flight Attendants*, 785 F.3d at 716. When an agency action is final because it creates a binding norm that alters the legal regime, the question of whether the action is a legislative rule is "easy." *NRDC*, 643 F.3d at 320.

That is the situation here. The Wehrum Memorandum makes its legal effect clear; it "reads like an edict," *Flight Attendants*, 785 F.3d at 717, instructing regional offices that the "unambiguous language" of Section 112 of the CAA "compels" "major source" reclassifications. *Wehrum Memorandum* at 1, 3. The document itself contains no disclaimers or caveats. Upon taking an enforceable limit on their potential to emit "below major source thresholds," major sources "*will not* be subject thereafter" to "major source" regulations. *Id.* at 4 (emphasis added). EPA's Federal Register Notice announced the new interpretation and binds EPA to the changed legal regime. As such, the Wehrum Memorandum is a legislative rule that failed to conform to the APA's notice-and-comment requirement. *Cf. Gen. Elec.*, 290 F.3d at 385.

Accordingly, I would grant the petitions for review and vacate the Wehrum Memorandum, and I respectfully dissent.